ORIGINAL

FILED
JUN 16 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STAN AND REBECCA BEECHAM, CHRISTOPHER AND JENNIFER BURGESS, CARL BRIDGES, JR., DENNIS CAMPBELL, GREGORY AND SUSAN COOK, LOUIS AND HELLEN DENNY, VICKY FINGAR, HAROLD FRANCIS, HARRIETTE GARRIQUES, MARGARET HALL, KENNETH AND ELIZABETH HENRY, DALE HOWELL, RONALD AND MARGARET KEGERRIES, MARK AND CAROLE LISTON, TONIE LOOMIS, CARL MCDONALD TRUST, BILLIE MOORE, SCOTT AND ELLEN MOSKALSKI, JEFFERY AND CAROL PATTERSON, DAVID AND LINDA PERCY TIMOTHY AND VICKEY PETERS, RUSTY AND REBECCA RIVES, VICTOR AND EMMA RYAN, LOUIS AND DIANA SCHIERBECK, DONALD SELSOR, FRANK AND SANA SHAGETS, DONALD AND DIXIE SHOUP, HEATHER ST. ONGE AND WILLIAM WARD, CYNTHIA A. STARK REVOCABLE TRUST, BENNIE AND JANE STEEPLES, RICHARD AND NORMA STILL, RICHARD AND EDITH STRATTON, JAMEY AND STEPHANIE THWREATT, RAY AND KELLEE UBER, RON, BELVA AND WILLIS WAGNER, JUDI WEBER, WILLIAM AND MARCY WEBER, DANA WEINRICH AND SAMUEL STRAIT, DONALD AND RILDA WHITEHEAD, STEVEN AND JOANN WHITEHEAD, CHARLES AND TERESA WILKINS, JOHN AND BILLIE WILKINS, HENRY AND VELMA WILLIAMS AND/OR LIVING TRUST GAREY AND DAISY WILSON, STEPHEN AND BONNIE YOUNG, LEGGETT & PLATT,INC., DAWSON HERITAGE FURNITURE CO., CARL JUNCTION UNITED METHODIST CHURCH )

Case No. 08-435 L

Plaintiffs, )
vs. )
THE UNITED STATES OF AMERICA )
Defendant. )

## COMPLAINT

Come Now the above captioned Plaintiffs, individually and collectively, by and through their attorney, R. Deryl Edwards, Jr., and for their respective cause of action against the Defendant, the United States of America ("USA"), state and allege as follows:

## INTRODUCTION

1. In 1876, the predecessor of the Burlington Northern and Santa Fe Railway ("BNSF") sought and received from the Jasper County, Missouri Circuit Court orders of the Court condemning private land for the construction of a railroad through Jasper County, Missouri, including a 15.93 mile corridor between Carthage, Jasper County, Missouri and the Missouri/Kansas state line. On June 21, 2002, the BNSF, having practically abandoned the railroad right-of-way between Carthage, Missouri and the Missouri/Kansas state line that encumbered Plaintiff's real property previously to that date, consented to the action of the federal Surface Transportation Board ("STB") in issuing a Notice of Interim Trail Use ("NITU") on the aforementioned rail corridor. Plaintiffs each had a state court and constitutionally protected reversionary interest in the railroad right-of-way and easement such that the easement reverted back to Plaintiffs when the railroad stopped using the land for railroad purposes in accordance with Missouri's Constitution, the Jasper County Circuit Court March 1876 judgments and orders and otherwise by common law. Upon abandonment, the United States of America,

pursuant to the so-called "Rails to Trails" federal statutory law, then gave the railroad right-of-way and, thus Plaintiff's reversionary interest, to a non-for- profit corporation for a public walking/riding trail. Plaintiff is seeking monetary compensation from the United States of America for the 5th Amendment taking of its reversionary interest and the added encumbrance of the trail, all pursuant to Section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) and proceedings before the Surface Transportation Board, Docket AB-6 (Sub-No. 395X).

**PARTIES**

2. Co-Plaintiffs, Carl Junction United Methodist Church, Leggett & Platt, Inc. and Dawson Heritage Furniture Co., were, at all times material, organized and existing corporations or limited liability companies under Missouri state law, located and/or having their principal place of business in Jasper County, Missouri and, as of June 21, 2002, each owned real property in Jasper County, Missouri, through which the Burlington Northern and Santa Fe Railway had a 100 foot railroad right-of-way subject to use of the right-of-way for railroad purposes.

3. The remaining individual co-Plaintiffs, individually and collectively, owned real property in Jasper County, Missouri, and as of June 21, 2002, each individual Plaintiff owned real property through which the Burlington Northern and Santa Fe Railway had a 100 foot railroad right-of-way subject to use of the right-of-way for railroad purposes.

4. On June 21, 2002, when the BNSF sought to abandon its 15.93 mile right-of-way in Jasper County, Missouri, then pursuant to the National Trails System Act Amendments of 1983, 16 U.S.C. §1241 *et seq.*, the United States of America (hereinafter referred to as "USA") exercised its right to take Plaintiff's reversionary interest in the railroad's

abandoned right-of-way by issuing a NITU, and further encumbered the right-of-way and Plaintiffs' property by making it a walking trail open to the public.

5. The United States of America is the Defendant from which relief is sought by virtue of the action of federal agency, the STB, and its issuance of a NITU on June 21, 2002, covering 15.93 miles of former railroad right-of-way through Jasper County, Missouri.

## JURISDICTION

6. Defendant USA took Plaintiff's reversionary interest in a railroad right-of-way across Plaintiffs' land and further encumbered Plaintiffs' land without paying for it as required under the Takings clause of the 5th amendment to the Constitution of the United States.

7. Plaintiffs individually and collectively assert these claims pursuant to the Tucker Act, 28 U.S.C. § 1491 et seq.

8. The amount in controversy for each set of Plaintiffs exceeds $10,000.00.

9. Jurisdiction and venue are otherwise proper in this Court.

## FACTS COMMON TO ALL COUNTS:

## 1876 CONDEMNATION FOR RAILROAD RIGHT-OF-WAY

10. In or about 1872, the first railroad company originating in Jasper County, Missouri, the Memphis, Carthage and Northwestern Railroad Company (the "MC&NRR"), initiated proceedings in the Jasper County, Missouri Circuit Court to condemn privately owned real property in Jasper County, Missouri for a railroad right-of-way. Additionally, the MC&NRR ultimately sought to secure a railroad right-of-way in

Lawrence County, Missouri, Newton County, Missouri, Cherokee County, Kansas and Labette County, Kansas.

11. In the early 1870's, the MC&NRR filed four or more civil actions in the Jasper County, Missouri Circuit Court seeking condemnation of private property for imposition of a railroad right-of-way: *Memphis, Carthage and North Western Rail Road Company, Plaintiff v. Jasper Smith, et al., Defendants,* Case No. 814, *Memphis, Carthage and North Western Rail Road Company, Plaintiff v. Issac Lamb, et al., Defendants,* Case No. 828, *Memphis, Carthage and North Western Rail Road Company, Plaintiff v. Evan Evans, et al., Defendants,* Case No. 905 and *Memphis, Carthage and North Western Rail Road Company, Plaintiff v. Elliott, et al., Defendants,* Case No. 928.

12. On March 13, 1876, the Jasper County, Missouri Circuit Court, in all of the above styled cases, entered a court order dated March 13, 1876, therein appropriating, for the benefit of the MC&NRR, a strip of land 100 feet wide, and in some places 125 feet wide, over and through the Plaintiff's real estate, wherein the Court stated:

> It is therefore ordered, adjudged and decreed that the Plaintiff (MC&NRR) may have, take and appropriate as a right of way for its Rail Road, a strip of land one hundred feet wide, that is, fifty feet equi-distant from the center of said Rail Road track when the same is located over and through the following described Lots, tracts & parcels of land belonging respectively to the defendants hereinafter named . . .

13. The Court, in its March 13, 1876 Judgment and Order, further held the following,

> The Plaintiff (MC&NRR) to have and to hold the easement and right of way for said Railroad over and through all of said lands as against said

defendants, their heirs and assigns so long as the same shall be used for the purposes of said Railroad.

14. The *Memphis, Carthage and Northwestern Rail Road* and each successive railroad company, including the Burlington Northern Santa Fe Railway, thereafter exclusively obtained and possessed the right-of-way over Plaintiff's property subject to a later reversion to the then owner of the real estate if the use for railroad purposes later ceased.

**RAILBANKING OF PLAINTIFFS' PROPERTY UNDER THE NATIONAL TRAILS SYSTEM ACT:**

**STB ISSUANCE OF THE JUNE 21, 2002 NITU**

15. The Memphis, Carthage and North Western Rail Road was the predecessor of the St. Louis and San Francisco Railway Company ("SLSF"). Subsequent to a succession of railroad companies, in 1980, the SLSF merged into the Burlington Northern Railroad Company ("BN"). The BN subsequently merged with the Atchison, Topeka and Santa Fe Railway in 1995 to become the Burlington Northern and Santa Fe Railway Company ("BNSF").

16. Since the merger of the SLSF and BNSF, the BNSF had operated, *inter alia,* a railroad line between mile post 343.55 in Columbus, Cherokee County, Kansas, through and including mile post 315.30 (the "Line") in Carthage, Jasper County, Missouri. The Plaintiff's real estate is located along this formerly operated line in the state of Missouri.

17. On or about May 3, 2002, the BNSF filed a Notice of Exemption of the Line with the Surface Transportation Board ("STB") to initiate the formal process for abandonment of the Line; STB Docket No. AB-6 (Sub No. 395X).

18. On May 10, 2002, the City of Carl Junction, Missouri and the Joplin Trail Coalition ("JTC"), represented by the same counsel, jointly filed comments before the STB, in part, requesting the issuance of a Notice of Interim Trail Use ("NITU") and the imposition of a public use condition pursuant to 49 C.F.R. 1152.28 and 49 U.S.C. 10905 for the purpose of railbanking public use of the existing railroad railbed based upon the express condition that the STB order the BNSF to not remove any bridges, trestles, culverts or "roadbed materials" for the Missouri portion of the rail corridor; MP 331.23 to MP 315.30.

19. On the same date, May 10, 2002, the JTC and the City of Carl Junction, Missouri filed, before the federal STB, a document entitled "Statement of Willingness to Assume Financial Responsibility" ("Statement of Willingness").

20. These Statements of Willingness, authored by purportedly authorized representatives of the respective commenters and, at least, ostensibly cloaked with corporate or other legal authority, simultaneously stated that each was, ". . . willing to assume full responsibility for management of, for any legal liability arising out of and for the payment of any and all taxes that may be levied or assessed against the right-of-way . . ."; a distance of 15.93 miles from the Kansas state line to near Carthage, Missouri.

21. On May 23, 2002, BNSF's Notice of Exemption was served and published in the Federal Register (67 FR 36298) and the exemption was scheduled to become effective on June 22, 2002.

22. On June 21, 2002, the STB issued a Decision that granted the commenters' request for issuance of a NITU and a public use condition.

23. On June 16, 2003, BNSF and JTC executed a document entitled, "**INTERIM TRAIL USE/RAILBANKING AND DONATION AGREEMENT**" ("Agreement"), and incorporated herein by this reference.

24. The Agreement purported to transfer BNSF's interests to the JTC, and upon notice, to the City of Carl Junction, Missouri, provided the City execute written acknowledgment of the Agreement and agreed to be bound to its terms.

25. On October 20, 2003, the BNSF posted a letter to the STB advising of the consummation of a railbanking agreement with the JTC. The BNSF further represented that, "The remainder of the right of way has been salvaged and BNSF's discontinuance of the subject line will be consummated on October 31, 2003."

26. Effective October 31, 2003, the BNSF discontinued its operations on the line and the JTC, a Missouri non-profit corporation, began operating a trail on the abandoned line.

27. On or about September 16, 2004, the BNSF entered into a Quitclaim Deed with the Joplin Trail Coalition, conveying BNSF's right, title and interest to any and all rights of way, reservations and easements of record between the Missouri-Kansas state line and Milepost 315.30 near Carthage, Jasper County, Missouri.

**COUNT I: FIFTH AMENDENT TAKING**

**LIABILITY**

28. Plaintiff hereby incorporates by reference *seriatim verbatim* paragraphs 1 through 27 as if fully herein set forth herein.

29. At all times material, Plaintiffs' respective real properties were encumbered and continued to be encumbered by the former BNSF railroad right-of-way at issue in the case at bar, as further encumbered now by the NITU and the subsequent aforementioned

railbanking agreement and quit claim deed, the extent of said encumbrance restricted by the provisions of federal railbanking law and Missouri common law, and each Plaintiff herein owned, in fee, the real property immediately underneath the right-of-way on the date of the issuance of the NITU.

30. Defendant, United States of America, enacted the National Trails System Act Amendments of 1983, 16 U.S.C. §1241 *et seq.*, which gave authority to the STB to permit the JTC and/or the City of Carl Junction to take the reversionary right-of-way interest from Plaintiff and for a new easement for trail use rather than railroad use.

31. Prior to issuance of the June 21, 2002 NITU by the STB, in accordance with Missouri law, the BNSF had abandoned the right-of-way by removal of track, removal of "diamonds" which prevented access to the Line, discontinuance of railroad operations and took other actions which evidenced abandonment of operation on the Line.

32. Article I, section 26, of the Missouri Constitution, states, in pertinent part, "*The fee of land taken for railroad purposes without consent of the owner thereof shall remain in such owner subject to the use for which it is taken.*" The italicized language of the Missouri Constitution, the property taken for "railroad purposes", was meant to revert back to the successor owner of the property once the railroad use of the property was terminated. However, federal law, by terms of the National Trail Systems Act, as amended, stopped the reversion of the property back to the captioned respective Plaintiff landowners and, instead, allowed the railbed to become used for recreational uses such as a walking trail.

33. Each of the Plaintiffs, in order to succeed on their claim under the Takings Clause to the Fifth Amendment, allege that they must individually show that the government took their property for public use without just compensation.

34. Each of the Plaintiffs allege that a takings claim, such as submitted for each Plaintiff herein, generally requires a two-step analysis in which a court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. Then, if the plaintiff does possess a property interest, the court decides if the governmental action at issue constituted a taking of that property

**PLAINTIFFS' COGNIZABLE PROPERTY INTEREST IN THE TAKING**

35. The action of the STB, in issuing the NITU on June 21, 2002, effectively thwarted the termination of the BNSF's rights-of-way over and through Plaintiffs' property, thereby preventing and preempting Plaintiffs' individual and collective property ownership rights arising under Missouri state law by operation of the Rails-to-Trails Act, which gives rise to the takings claims submitted by Plaintiffs.

36. The Plaintiffs, individually, assert that the full use of the fee underlying the BNSF's easement and right-of-way would have been unimpaired but for the operation of the Trails Act.

37. The Plaintiffs exclusively held the fee interest in the BNSF right-of-way and none of the individual Plaintiffs held less than the fee interest in the right-of-way, the same having been originally recognized by the Jasper County, Missouri Circuit Court by that Court's March 13, 1876 condemnation judgments issued against all landowners from Carthage, Missouri to the Missouri/Kansas state line.

38. BNSF, through an unbroken series of predecessor railroad entities, originally acquired the right-of-way over and through Plaintiffs' respective properties by condemnation actions in the Jasper County, Missouri Circuit Court in 1876, thereby taking but a mere easement and/or right-of-way over the land and not the fee.

## THE NITU AS GOVERNMENTAL ACTION CONSTITUTING A TAKING

39. The respective Plaintiffs, each holding a valid property interest, sustained a "taking" of their respective property interests by the United States government, by the government's actions of destroying, physically occupying, or excessively regulating Plaintiffs' property interest for a public purpose.

40. Under Missouri state law, a railroad easement or right-of-way may arise through condemnation, through an express or implied grant, through prescriptive use, or through estoppel, however, where the acquisition, as in the present case, is for right-of-way only, whether by condemnation, voluntary grant, or conveyance in fee upon valuable consideration, the predecessor of the BNSF then and the BNSF, at the time of the NITU, held only an easement over the land and not the fee.

41. When use of the easement for railroad purposes of the BNSF ceased, however, title to the fee was presumed to be in the abutting respective Plaintiff land owners to the center of the right-of-way in the absence of contrary evidence that the right-of-way was taken from the land of only one of the abutting landowners.

42. The issuance of the June 21, 2002 NITU established a new easement which purported to preserve railroad use. Once BNSF abandoned the easement, the easement terminated and a new easement was created in favor of the Joplin Trail Coalition and/or the City of Carl Junction by operation of the Rails to Trails Act.

43. A Fifth Amendment "taking" occurred to each Plaintiff's property interest when, pursuant to the Trails Act, Missouri state law based reversionary interests were effectively eliminated in connection with the conversion of the Line and the former BNSF railroad right-of-way to trail or public use.

44. The Fifth Amendment "taking" of Plaintiffs' respective properties, under the Rails-to-Trails Act, was accomplished when the June 21, 2002 NITU was issued on the Line and Missouri state law reversionary interests that would otherwise take effect pursuant to normal rail line abandonment proceedings were forestalled.

45. These above described actions of the STB in issuing the June 21, 2002 NITU, taken in conjunction with the invocation of the Rails-to-Trails Act, have resulted in a 5th Amendment "taking" by the federal government of the Plaintiffs' real property for which the United States owes each Plaintiff landowner a categorical duty to provide compensation, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.

46. On October 31, 2003, but for the actions of the JTC and the USA, the BNSF's railroad the right-of-way property interest would have reverted back to Plaintiff, the owner of the property.

47. Defendant USA, acting through the STB, granted the JTC Plaintiff's reversionary interest in the railroad the right-of-way and further encumbered the land with a trail open to the public instead of a railroad for railroad use only.

48. When the STB gave the JTC and/or City of Carl Junction plaintiff's reversionary interest in the railroad right-of-way and further allowed a new encumbrance of the land, public trail use, then the STB, on behalf of the United States under the Rail National

Trails System Act, effected a Takings under the Fifth Amendment of the U.S. Constitution.

49. Because the USA has taken Plaintiff's reversionary interest and further encumbered the Plaintiff's land, then the USA must pay an amount of compensation that is fair and reasonable as defined by Missouri law.

## COMPENSATORY DAMAGES

50. The United States government, by its issuance of the June 21, 2002 NITU on the Line, appropriated the respective Plaintiffs' private property for a public purpose without compensation, notwithstanding the requirement of the United States' Constitution that the government must pay the owner "just compensation" and imposes on the court the duty of determining what compensation is just, meaning the full monetary equivalent of the property taken. Each Plaintiff, as property owners, should be put in the same financial position as if there had been no taking by virtue of an NITU.

51. The Plaintiffs seek recovery of damages for the taking in terms of determining fair market value of each property owned by Plaintiffs, including, but not limited to the consideration of the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future to the full extent that the prospect of demand for such use affects the market value while the property is privately held and made in light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof.

52. Each Plaintiff landowner alleges that the actions of the United States government, in issuing the NITU and otherwise acting pursuant to the federal railbanking law and/or regulation, constituted a physical, partial taking of Plaintiffs' properties, thereby entitling

each respective Plaintiff to individual damages calculated as the difference in value of the property before and after the taking.

53. The Plaintiffs individually seek damages, for a partial taking by the Defendant, the "before and after" calculation of damages for which requires a determination of the fair market value of the entire affected parcel as if the easement did not exist and then another determination in light of the taking. Furthermore, each parcel owned by Plaintiffs affected by the taking may include land not directly the subject of the easement, but nonetheless which was impacted by severance damages, including, but not limited to damages for fencing installation and/or repair.

54. The Plaintiffs' request damages which include the value of the part actually taken by the government's actions, together with any severance damages affecting the value of the remaining parcel, the damages for Plaintiffs' severance damages being based upon the difference between the value of the property before and after the taking.

## COMPOUND PREJUDGMENT INTEREST

55. The Plaintiffs also request the Defendant pay just compensation, which necessarily requires that the Plaintiffs, as owners of the property taken by government, be compensated not only for the value of the property on the date of the taking, but also for any delay in payment of that amount. The Plaintiffs, in order to afford complete relief in a just compensation action, are each entitled to interest accruing from the date of the taking – June 21, 2002. The Plaintiffs request that the Court determine a sufficient rate of annual interest from June 21, 2002 and award the same to the Plaintiffs based upon the government's delay in paying any compensatory damages to them arising out of the taking which occurred by the issuance of the NITU.

56. Plaintiffs likewise request that the Defendant, in determining whether a particular rate of interest is sufficient under the Fifth Amendment to provide the full and perfect equivalent of the property taken, set a rate of annual interest based upon the "prudent investor rule." Plaintiffs assert that the appropriate interest rate should be calculated based, not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how "a reasonably prudent person" would have invested the funds to produce a reasonable return while maintaining safety of principal, including a rate of return which would have been achieved on accounts whose mix of investment instruments which provides a reasonable rate of return consistent with a high level of safety.

57. The Plaintiffs' claim for recovery of interest for the delay in receiving payment for the taking of Plaintiffs' properties necessarily includes a request for compounded annual interest, in that an award of compound interest is necessary to provide just compensation to the Plaintiffs. Plaintiffs assert that, based on the facts and circumstances in this particular case, an award of compound interest fits with the prevailing policy to accomplish complete justice as between the Plaintiffs and the United States under the just compensation clause of the Fifth Amendment in that the government's delay from June 21, 2002 until its payment for "taken" property, mandates that an award of compound interest is appropriate.

**LITIGATION COSTS, EXPENSES, EXPERT WITNESS AND ATTORNEY FEES**

58. The Plaintiffs each observe that, when the government takes property without initiating condemnation proceedings, as it did in the case sub judice by issuing the NITU on June 21, 2002, it effectively shifted to the Plaintiff landowners the burden to discover

the encroachment and to take affirmative action to recover just compensation. Plaintiffs assert that Congress provided the Plaintiffs with remedies that seek to overcome the significant disadvantage borne by the Plaintiffs in such a case - 42 U.S.C. § 4654(c).

59. The Plaintiffs each seek recovery of their respective litigation costs, expenses, expert witness fees, including appraisal fees, and attorney fees, in part, actually incurred because of the captioned action, pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), 42 U.S.C. § 4654(c) titled, "Litigation expenses". Section 4654(c) provides,

> (c) Claims against the United States. The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of title 28, United States Code [28 USCS §§ 1346(a)(2), 1491], awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

60. The Plaintiffs have brought the action against the Government pursuant to the Tucker Act, 28 U.S.C. 1491, in the U.S. Court of Claims as the claims of the Plaintiffs exceed the minimum jurisdictional limits of $10,000.

61. The Plaintiffs request reimbursement of the appraisal fees "actually incurred" in the proceeding by the Plaintiffs' retained appraiser, Hayden Harrison, of the Springfield, Missouri firm of Harrison and Company for all appraisal fees and expenses incurred in providing the appraisal of the Plaintiffs' properties.

62. Furthermore, the Plaintiffs seek reimbursement of all litigation costs, disbursements and expenses incurred in the captioned proceeding.

63. The Plaintiffs request that the attorney's fees and expenses of Plaintiffs' counsel be awarded by the Court in an amount as agreed to by and between the Plaintiffs and their undersigned counsel, at his option, at $350 per hour or a one third (33%) contingency, as set forth in a written agreement whereby the Plaintiff clients have committed to the counsel's compensation amount and the method and market rate to determining his compensation as counsel for each Plaintiff. The written agreement between each Plaintiff and the undersigned counsel, whereby the compensation methods and rates are consensually agreed to by the attorney and client, is prima facie evidence of the reasonable and appropriateness of the fees and expenses.

WHEREFORE, Plaintiffs individually and/or collectively pray for judgment against Defendant, The United States of America, in an amount that is fair and reasonable in excess of $10,000, for compound prejudgment interest, for reasonable attorney's, paralegal and related fees, costs and expenses, appraisal fees, expert witness fees, abstracting/realtor fees, litigation costs, expenses and for such other and further relief as the Court deems just and proper.

Respectfully Submitted,

LAW OFFICES OF R. DERYL EDWARDS, JR.
R. Deryl Edwards, Jr. MO# 48277
606 S. Pearl Ave.
Joplin, MO 64801-2582
(417) 624-1962
(417) 624-1965
rde417@hotmail.com
ATTORNEY FOR THE PLAINTIFFS